1

2

3

4

5

6

7                            UNITED STATES DISTRICT COURT

8                        FOR THE EASTERN DISTRICT OF CALIFORNIA

9

10   BRENT LEE HARDING,                          No. 2:21-cv-00922 KJM SCR P

11                  Plaintiff,

12        v.                                      <u>FINDINGS & RECOMMENDATIONS</u>

13   CORRECTIONAL HEALTH SERVICES,
     et al.,
14
                    Defendants.
15

16

17        Plaintiff is a state prisoner proceeding pro se and in forma pauperis with a civil rights

18   action under 42 U.S.C. § 1983.  Defendants Holt (ECF No. 50) and Mencias (ECF No. 51) have

19   filed separate motions for summary judgment.  For the reasons set forth below, the undersigned

20   recommends that defendants' respective motions be granted.

21                                        **BACKGROUND**

22        Plaintiff filed the operative first amended complaint ("FAC") on January 10, 2022.  (ECF

23   No. 8.)  He alleged that on April 23, 2021, upon transfer to the Rio Consumnes Correctional

24   Center ("RCCC"), he submitted "medical kites" concerning eyelid pain and discoloration.  (<u>Id.</u> at

25   1.)  Defendant Holt, a nurse practitioner ("NP"), told plaintiff he was put on a list to see a doctor.

26   (<u>Id.</u> at 1-2.)  Plaintiff was not seen by a doctor until June 9, 2021.  (<u>Id.</u>)  Defendant Mencias, the

27   senior nurse in charge of referrals, did not refer plaintiff to an ophthalmologist.  Instead, she

28   referred him to an Ear, Nose, and Throat ("ENT") specialist on July 15, 2021.  (<u>Id.</u> at 3.)

1    A growth later determined to be Basal Carcinoma was removed from plaintiff's eyelid

2    "six months after [plaintiff] asked to be seen[.]"  (ECF No. 8 at 4.)  However, plaintiff's eye pain

3    and vision issues were not addressed.  (Id.)  Plaintiff "brought this up" to defendant Holt but was

4    informed his issues were being taken care of but if he put in any more kites, he was going to "get

5    in trouble."  (Id.)  Plaintiff was not seen by a doctor again until sometime after December 2021.

6    (Id.)  That doctor, who was not an ophthalmologist, diagnosed plaintiff with chronic dry eye and

7    prescribed a cream.  (Id. at 4-5.)  The previously assigned magistrate judge screened the FAC and

8    found it stated Eighth Amendment medical indifference claims against Holt and Mencias.[1]  (ECF

9    No. 9.)  Plaintiff elected to proceed on the FAC as screened.  (ECF No. 11.)

## DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT

### I.    Defendant Holt's Motion

12    Defendant Holt moves for summary judgment on two primary grounds.  First, he argues

13    that plaintiff did not adequately allege, and cannot prove, that Holt made an intentional decision

14    regarding plaintiff's care that put plaintiff at substantial risk of suffering serious harm.  (ECF No.

15    50-2 at 1-2.)  Second, defendant Holt argues that plaintiff cannot prove and produce evidence that

16    Holt's conduct was objectively unreasonable.  (Id.)  Defendant supports his standard of care

17    arguments with the expert analysis of Dr. Paul Adler, D.O.  (ECF No. 50-1, Exh. 1.)

### II.    Defendant Mencias' Motion

19    Defendant Mencias argues that her involvement in plaintiff's care was administrative and

20    that she did not directly render any medical care to him.  As such, plaintiff's § 1983 claim fails

21    for inadequate linkage.  (ECF No. 51-1 at 10-11.)  Further, Mencias asserts that the care plaintiff

22    did receive outside of her involvement conformed to the standard of care, id. at 13, and submits

23    the expert declaration of David J. Kiener, M.D., for support (ECF No. 51-3 at 79-85).  In the

24    alternative, defendant Mencias argues that she is entitled to qualified immunity.  (Id. at 15-16.)

### III.    Plaintiff's Opposition

26    Plaintiff did not timely oppose defendants' motions for summary judgment.  On March 4,

---

[1]  The parties now agree that plaintiff's medical care claims arise under the Fourteenth
Amendment because he was a pretrial detainee during the events underlying the complaint.

1    2025, the undersigned ordered plaintiff to respond and show cause for his failure to do so on time.

2    (ECF No. 54.)  In response, plaintiff explained that he preemptively filed a declaration before

3    defendants moved for summary judgment and asked the court to accept it as his opposition.  (ECF

4    No. 55 at 1-2.)  Because plaintiff did not identify the declaration, the undersigned granted

5    plaintiff another extension of time to clarify his opposition and advised plaintiff to review Rule 56

6    and Local Rule 260 requirements for opposing motions for summary judgement.  (ECF No. 56.)

7    Plaintiff subsequently submitted a "declaration of facts" and asked the court to accept it as his

8    opposition.  (ECF Nos. 57, 58.)  Within that declaration, plaintiff refers to a packet of exhibits he

9    submitted earlier in the case (ECF No. 42) containing medical grievance documentation and

10    filings from his state habeas proceedings, Case No. 21HC00267, filed on June 1, 2021.[2]

11        Plaintiff's opposition materials do not comply with Local Rules.  Plaintiff did not

12    reproduce defendants' itemized statement of undisputed facts (ECF Nos. 50-5, 51-2) and identify

13    which are admitted and which are disputed as required by Local Rule 260(b).  "Pro se litigants

14    must follow the same rules of procedure that govern other litigants."  King v. Atiyeh, 814 F.2d

15    565, 567 (9th Cir. 1987) (citation omitted), overruled on other grounds, Lacey v. Maricopa

16    County, 693 F.3d 896, 928 (9th Cir. 2012) (en banc).

17        However, it is well-established that district courts are to "construe liberally motion papers

18    and pleadings filed by pro se inmates and should avoid applying summary judgment rules

19    strictly."  Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010).  Accordingly, the court

20    considers the record before it in its entirety despite plaintiff's failure to strictly comply with the

21    Local Rules.[3]  See Adv. Comm. Note to 2010 Amendments to Fed. R. Civ. P. 56(e)(4) ("[T]he

22    court may seek to reassure itself by some examination of the record before granting summary

23    judgment against a pro se litigant.").  The exception is plaintiff's unverified FAC (ECF No. 8),

24    _____

25    [2]  The court takes judicial notice of the existence of this case sua sponte.  See Harris v. County of
Orange, 682 F.3d 1126, 1131-32 (9th Cir. 2012) (a court may take judicial notice of undisputed

26    matters of public record including documents on file in state courts).  Sacramento County
Superior Court records can be found at

27    https://services.saccourt.ca.gov/PublicCaseAccess/Criminal (last accessed Aug. 1, 2025).
[3]  By extension, the undersigned declines defendant Mencias' request (ECF No. 59) to construe

28    his noncompliance as a waiver of opposition.

1  which cannot serve as an opposing affidavit.  See Jones v. Blanas, 393 F.3d 918, 923 (9th Cir.

2  2004) (only a complaint submitted in substantial compliance with the form prescribed in 28

3  U.S.C. § 1746 may serve as an opposing affidavit under Rule 56).

4  **IV.    Material Facts**

5  The parties agree that plaintiff was incarcerated at Sacramento Main Jail on March 17,

6  2021, transferred to RCCC on April 23, 2021, and remained a pretrial detainee during the events

7  underlying the complaint.  (See J. Holt's Statement of Undisputed Facts ("Holt SUFs") 1-2, 4,

8  ECF No. 50-5 at 1-2; G. Mencias' Statement of Undisputed Facts ("Mencias SUFs") 1, 5-6, ECF

9  No. 51-2 at 1-2.)  Because it is difficult to discern from his opposition which facts plaintiff

10  disputes, the court has laid out each party's version of events below.

11  **A.  Defendant Holt's Statement of Facts[4]**

12  **i.    Timeline of Care**

13  Defendant Holt maintains that on March 20, 2021, a Registered Nurse ("R.N.") H. Carl

14  examined plaintiff and found he had no eye related issues.  (Holt SUF 3.)  Plaintiff then submitted

15  a medical kite regarding the growth on his left eye on April 23, 2021, after transferring to RCCC.

16  (Holt SUFs 4, 5.)  On April 26, 2021, plaintiff complained to I. Agunanne, R.N., about a bump on

17  the lower left eyelid.  Agunanne noted the bump and complaints of blurred vision.  (Holt SUF 6.)

18  Plaintiff was seen by S. Burnett, a Nurse Practitioner ("NP"), for his eye complaints on May 3,

19  2021.  Burnett recommended a warm water compress as needed and made a dermatology referral

20  to rule out Basal Cell Carcinoma.  (Holt SUF 7.)

21  Defendant Holt, an NP, treated plaintiff four times in his capacity as an as-needed medical

22  service provider contracted by the County of Sacramento, including twice regarding plaintiff's

23  eye issues.  (Holt SUF 8.)  In that role, Holt did not have control over the inmates that he would

24

---

25  [4]  Holt requests judicial notice of plaintiff's FAC under Cal. Evidence Code § 452(d) to establish
plaintiff's status as a pretrial detainee.  (ECF No. 50-4.)  The request is governed by Federal Rule

26  of Evidence 201, which permits judicial notice of facts "not subject to reasonable dispute."  Fed.
R. Evid. 201(b).  Because the FAC is unverified, defendant's request is denied.  See Miskam v.

27  McAllister, No. 2:08-2229 JMS, 2010 WL 3734167, at *3 (E.D. Cal. Sept. 21, 2010) (declining to
judicially notice unverified complaint).  Furthermore, the request is unnecessary because the

28  parties do not dispute plaintiff's pretrial detainee status.

1    see daily, nor did he have specific inmates assigned to his care.  Holt would only learn about the

2    identity of the inmate he was seeing on the day he would see them.  (SUF 9.)  Holt would then

3    prioritize which inmates to see by their level of need.  (Holt SUFs 10, 11.)

4         On May 28, 2021, defendant Holt saw plaintiff for the first time to address complaints of

5    bilateral ankle pain.  Holt addressed the concern by providing a 90-day lower bunk chrono.  (Holt

6    SUFs 12, 13.)  Plaintiff's second visit with Defendant Holt, and his first concerning his eye,

7    occurred on June 2, 2021.  (Holt SUF 14.)  Holt conducted an initial visual examination, a

8    problem-specific physical examination focusing on the skin around the left lower eyelid, and an

9    eye exam.  (Holt SUF 16.)  Holt noted that plaintiff had a left lower eyelid lesion that began

10   growing and had color changes in the last year and that the lesion had no prior medical history of

11   evaluation.  (Id.)  Defendant Holt confirmed that plaintiff had an appointment with a

12   dermatologist that would address the lesion and recommended plaintiff see an ophthalmologist.

13   (Holt SUF 17.)

14        Plaintiff then met with Dr. A. Ierokomos at San Joaquin Hospital on August 17, 2021.  Dr.

15   Ierokomos assessed the lesion as possible Basal Carcinoma that would be removed through

16   surgery.  (Holt SUF 19.)  Plaintiff's third visit with defendant Holt occurred on August 23, 2021.

17   (Holt SUF 20.)  Holt conducted an initial visual examination and, to prepare plaintiff for his

18   planned surgery to remove the lesion, performed a pre-operation physical including examination

19   of the left eyelid lesion, heart, and lungs, ordered pre-operation lab tests, and educated and

20   encouraged plaintiff to keep his pending surgical appointment.  (Holt SUFs 21, 22.)  Plaintiff's

21   final visit with defendant Holt occurred on August 30, 2021.  Holt gave plaintiff a 90-day lower

22   bunk renewal and confirmed that Protonix controlled his gastroesophageal reflux disease

23   symptoms.  (Holt SUF 23.)

24        Dr. Ierokomos removed the probable Basal Cell Carcinoma on plaintiff's eyelid on

25   October 4, 2021.  (Holt SUF 24.)  Plaintiff had a follow-up ENT consult on October 19, 2021,

26   where he confirmed he was healing fine.  (Holt SUF 25.)  On October 28, 2021, Dr. Nageswaran

27   noted he would ask the case manager to follow up on the ophthalmologist referral as plaintiff was

28   reporting vision issues.  (Holt SUF 26.)  Plaintiff then received treatment from various other

5

1    medical providers from December 2021 through December 2022, when he confirmed he no

2    longer experienced blurred vision, photophobia, pain, or watering.  (Holt SUFs 27-32.)

3                            **ii.    Expert Opinion of Dr. Paul Adler, D.O.**

4         Defendant Holt submits the expert declaration of Dr. Adler, a Doctor of Osteopathic

5    Medicine who is familiar with the standard of care of Nurse Practitioners and who has overseen

6    care for inmates who have eye-related complaints, including those eventually diagnosed with

7    Basal Cell Carcinoma.  (Holt SUFs 33, 34.)  Dr. Adler reviewed plaintiff's medical records and

8    determined that on June 2, 2021, defendant Holt gave plaintiff a thorough eye examination based

9    on his clinical complaint and properly recommended that plaintiff see a dermatologist for his

10   eyelid lesion and an ophthalmologist for his possible myopia and eye lesion.  (Holt SUFs 35-37.)

11   Given that records show plaintiff was found well developed, hydrated and not in acute distress,

12   Dr. Adler opined that defendant Holt exercised the proper standard of care.  (Holt SUF 38.)  Dr.

13   Adler further stated that plaintiff's lesion constituted a "non-emergent" referral that takes 1 to 3

14   months in a carceral setting.  (Holt SUF 39.)

15        Dr. Adler further opined that defendant Holt excised the proper standard of care during the

16   clinical visit on August 23, 2021, which he labelled a "pre-operation encounter."  (Holt SUFs 40,

17   41.)  Dr. Adler noted that defendant Holt properly examined plaintiff regarding his upcoming

18   surgical excision of the lesion near his left eyelid, reviewed his medical records and history, and

19   encouraged plaintiff to keep his surgery appointment.  (Holt SUF 42, 43, 47.)  Regarding

20   plaintiff's surgical and post-operation care by other medical providers, Dr. Adler determined that

21   plaintiff's eye issues, including the lesion under his left eyelid and later reported pain and vision

22   issues, were given proper medical attention and resolved.  (Holt SUF 44-46.)

23                         **B.  Defendant Mencias' Statement of Facts**

24                            **i.    Timeline of Care**

25        Defendant Mencias is the Health Program Coordinator for Sacramento County Health.

26   (SUF 34.)  As the Health Program Coordinator, Mencias operates in an administrative capacity,

27   and does not administer treatment, refer patients to outside specialists, or medically assess

28   patients, nor does she control when, and by whom a patient gets seen.  (SUF 35.)

In the days following surgery on October 4, 2021, plaintiff had three separate wound care appointments with RNs. (Mencias SUFs 18-20.)  On October 19, 2021, plaintiff had a follow-up appointment with Dr. Ierokomos.  Plaintiff reported no complaints, and the notes indicate that further wound care was not needed.  (Mencias SUF 21.)  Plaintiff then saw Dr. Nageswaran at RCCC on October 21, 2021, whose notes indicate that plaintiff relayed Dr. Ierokomos' position that plaintiff was healing well.  (Mencias SUF 22.)

On October 27, defendant Mencias authored a note indicating that she became generally aware that plaintiff was seeking to know the results following the surgical removal of the lesion. She did not see, speak to, or treat Plaintiff on this date.  (Mencias SUF 23.)  Plaintiff was scheduled to be seen by the in-house doctor who could address plaintiff's inquiry.  (Id.)  On November 2, 2021, an optometry consultation was ordered by Licensed Vocational Nurse ("LVN"), K. Gonzales.  Dr. G. Nugent signed the consultation order two days later.  The medical transport unit was to schedule the appointment.  (Mencias SUF 24.)

Plaintiff was seen by defendant Mencias on December 9, 2021, for a welfare visit made at the request of the Judge presiding over his state court habeas action.  (Mencias SUF 25.)  Mencias claims to have operated as the Health Program Coordinator in an administrative role, during this visit.  (Mencias SUF 36.)  Plaintiff voiced complaints about an intermittent burning sensation in his eye.  His pain was noted to be minor.  Mencias scheduled him to be seen by the jail's in-house doctor to address his eye burning complaints.  (Mencias SUF 25.)

On December 10, 2021, Plaintiff was seen for dry eye/burning complaints by Dr. Pardeep Kahlon.  Plaintiff relayed that his left eye burning occurred 2-3 times per week and lasted about 10 minutes each time.  He mentioned using eye drops on the "outside" and claimed that they were helpful.  Dr. Kahlon prescribed ophthalmologic ointment and counseled Plaintiff on application. Plaintiff verbalized his understanding and consented to the treatment.  (SUF 26.)

Between January 3, 2022, though January 17, 2022, Plaintiff submitted kites claiming to still be in pain, and claiming difficulty in applying the ophthalmologic ointment.  Each time, sick call referrals were placed so he could be seen by nurses.  (Mencias SUF 27.)  On January 21, 2022, Plaintiff was seen by Nurse Alex Kuzmenko to address the eye burning.  Plaintiff reported

7

1   that the ointment prescribed was not effective.  He denied any swelling or discharge. His eye

2   presented without redness, or swelling, discharge.  Plaintiff was advised of good hygiene

3   practices and counseled on his medication and treatment.  He was told to notify medical if he

4   experienced any worsening of symptoms.  Plaintiff verbalized his understanding.  (Mencias SUF

5   28.)

6           **ii.**    **Expert Opinion of Dr. Kiener**

7         Dr. David Kiener is board certified in otolaryngology and facial plastic reconstructive

8   surgery.  (Mencias SUF 29.)  Having reviewed plaintiff's medical file, Dr. Kiener opines that all

9   treatment rendered was within the standard of care and did not cause plaintiff any injury.

10   (Mencias SUFs 30, 31.)  According to Dr. Kiener, plaintiff was appropriately referred to

11   dermatology and otolaryngology, and any delay between Plaintiff's complaints about the lesion

12   and the surgical removal was neither unexpected, nor did it cause Plaintiff injury.  (Mencias SUFs

13   31, 32.)  Similarly, based on Dr. Kiener's knowledge, skill, and experience, and to a reasonable

14   degree of medical certainty, any delay between plaintiff's complaints of dry eye/pain/burning and

15   treatment did not cause any injury.  (Mencias SUF 33.)

16         **C.  Plaintiff's Declaration of Facts**

17         Plaintiff states that at the time of his arrest on March 17, 2021, he had what appeared to be

18   a mole on his left lower eyelid.  (ECF No. 58 at 1.)  It began to bleed and change colors within the

19   first day or two in the Main Jail.  (Id.)  This led plaintiff to start filing medical kites.  Plaintiff was

20   never seen by medical staff while in the Main Jail.  (Id.)

21         Plaintiff filled out a medical kite during his intake at RCCC on April 23, 2021.  (ECF No.

22   58 at 2.)  After not being seen, plaintiff filed a medical grievance on April 26, 2021.  (Id.)  In the

23   grievance, plaintiff complains of issues with his feet, ankle, and hips, as well as what he suspects

24   is a "cancerous mole" on his eyelid.  (ECF No. 42 at 7.)  Plaintiff claims RCCC did not address

25   this grievance until ten months later.[5]

26   _____

27   [5]  Plaintiff submitted an investigation summary dated March 19, 2022, stating that the grievance
was "resolved" in part because "[i]n October 2021, you were diagnosed with small Basal

28   Carcinoma, adequate Dermatology referral and care were received."  (Id. at 9.)  But it is not clear
whether the investigation summary was in response to the April 2021 grievance, the medical

1    Plaintiff claims he was finally seen by defendant Holt at the beginning of May 2021. Holt

2    told him there was nothing wrong with him, that it was a mole, and he needed to go back to his

3    pod. (ECF No. 58 at 2.) Plaintiff then put in another kite. He is not sure how many times he saw

4    defendant Holt between May and June but remembers feeling hopeless and fearful. (Id.) This led

5    to plaintiff filing a writ in Sacramento Superior Court, Case No. 21HC00267, on June 1, 2021.

6    (Id.)

7    Plaintiff claims he wore down defendant Holt and eventually received a doctor referral.

8    (ECF No. 58 at 2.) In June, plaintiff was told he was going to see a doctor. He was walked over

9    to medical, put in a room and a nurse held what looked like an iPhone up to his face to be "seen"

10    by a dermatologist. (Id. at 3.) The dermatologist could see his eye "was bad" and said plaintiff

11    needed to see an ophthalmologist. (Id.)

12    On July 9, 2021, Superior Court Judge Sweet asked respondents in the habeas action "to

13    provide the court with reasonably available documentary evidence regarding the medical

14    condition of the growth under petitioner's eye, whether petitioner has been seen by medical

15    personnel, and whether any of petitioner's grievances have been addressed concerning this

16    growth." (ECF No. 42 at 17-18.) In response, defendant Mencias referred plaintiff to an ENT,

17    not an ophthalmologist as Dr. Wong ordered. (ECF No. 58 at 3.) On July 19, 2021, respondents

18    responded by submitting a declaration from defendant Mencias with the results of her medical

19    chart review. (Id. at 13-14.)

20    Judge Sweet criticized Mencias' declaration in an order dated August 9, 2021, writing that

21    it "sheds no light on what conclusions the various medical personnel had made concerning

22    whether petitioner has a growth under or on his eye" or why petitioner was referred to an ENT for

23    an issue with his eye. (ECF No. 42 at 22.) He added:

24    [I]t does not appear that petitioner has yet been seen by a specialist qualified to
      examine a growth under or on a person's eye and determine whether further
25    testing and treatment is required. The court remains concerned that a growth
      under or on the eye may be a matter of urgency."
26

27

28    grievance plaintiff submitted on March 4, 2022, or both. (See ECF No. 42 at 10-11.)

9

1    (Id. at 23.)  Judge Sweet then ordered respondents to show cause why the writ of habeas corpus

2    should not issue.  (Id.)

3        Plaintiff claims he put in another kite in September 2021 because his eye growth was still

4    bleeding and changing color.  (ECF No. 58 at 5.)  He then saw defendant Holt who was more

5    "gruff and difficult" than usual.  Defendant Holt told plaintiff there was nothing wrong with him

6    and that he would get in trouble if he continued putting in kites.  (Id.)  Plaintiff claims it took

7    "monitoring" from the Superior Court to get defendant Mencias and RCCC to get him into

8    surgery in October 2021.  (Id.)

9        Plaintiff maintains he was still in pain after the surgery.  (ECF No. 58 at 5.)  Because of

10   Holt's warning to stop submitting kites, plaintiff only communicated with the attorney appointed

11   through his writ.  (Id.)  On December 10, 2021, Judge Sweet issued an order directing the

12   Sheriff's Department to have plaintiff "seen by a staff physician and if necessary, the appropriate

13   specialist for a medical examination to determine the cause of his pain."  (ECF No. 42 at 26.)

14   The court retained jurisdiction "until Mr. Harding's eye pain has been resolved."  (Id.)  Plaintiff's

15   papers do not shed further light on the outcome of the habeas proceedings, although Case No.

16   21HC00267 is still listed as "active" on the Superior Court's website.

17       Plaintiff received a cream for his eye that did not work.  (ECF No. 58 at 6.)  He then filed

18   a grievance on March 4, 2022, and received eye drops.  (Id.)  Plaintiff alleges that for a year he

19   was in "constant pain" and that defendant Mencias and her staff were indifferent to his life-

20   threatening situation.  (ECF No. 58 at 6.)

21                          **LEGAL STANDARD**

22   **I.    Summary Judgement**

23       Summary judgment is appropriate when it is demonstrated that there "is no genuine

24   dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

25   Civ. P. 56(a).  Under summary judgment practice, "[t]he moving party initially bears the burden

26   of proving the absence of a genuine issue of material fact."  In re Oracle Corp. Sec. Litig., 627

27   F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  The

28   moving party may accomplish this by "citing to particular parts of materials in the record,

                                    10

including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

"Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." Oracle Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325); see also Fed. R. Civ. P. 56(c)(1)(B). Indeed, summary judgment should be entered, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323. In such a circumstance, summary judgment should "be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(c). The opposing party must demonstrate that the fact in contention is material, i.e., a fact "that might affect the outcome of the suit under the governing law," and that the dispute is genuine, i.e., "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual

11

1    dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

2    trial." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

3    The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to

4    see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Adv. Comm.

5    Note to 1963 Amendments to Fed. R. Civ. P. 56(e)).

6         In resolving the summary judgment motion, the evidence of the opposing party is to be

7    believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the

8    facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475

9    U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's

10   obligation to produce a factual predicate from which the inference may be drawn. See Richards

11   v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902

12   (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than

13   simply show that there is some metaphysical doubt as to the material facts.... Where the record

14   taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

15   'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

16   **II.    Fourteenth Amendment Inadequate Medical Care**

17        The parties agree plaintiff was a pretrial detainee during the events underlying his FAC.

18   When filed by pretrial detainees, claims of violations of the right to adequate medical care

19   proceed under the Fourteenth Amendment and "must be evaluated under an objective deliberate

20   indifference standard." Gordon v. Cnty. of Orange, 888 F.3d 1118, 1124-25 (9th Cir. 2018)

21   (quoting Castro v. Cnty. of Los Angeles, 833 F.3d 1060, 1070 (9th Cir. 2016) (en banc)). The

22   elements of a civil detainee's Fourteenth Amendment medical care claim are:

23            (i) the defendant made an intentional decision with respect to the conditions under
             which the plaintiff was confined; (ii) those conditions put the plaintiff at
24            substantial risk of suffering serious harm; (iii) the defendant did not take
             reasonable available measures to abate that risk, even though a reasonable official
25            in the circumstances would have appreciated the high degree of risk involved—
             making the consequences of the defendant's conduct obvious; and (iv) by not
26            taking such measures, the defendant caused the plaintiff's injuries.

27   Id. at 1125. "With respect to the third element, the defendant's conduct must be objectively

28   unreasonable, a test that will necessarily turn on the facts and circumstances of each particular

1    case." Id. "The mere lack of due care by a state official does not deprive an individual of life,

2    liberty, or property under the Fourteenth Amendment." Id. (internal quotation omitted). "Thus,

3    the plaintiff must prove more than negligence but less than subjective intent – something akin to

4    reckless disregard." (Id. (internal quotation omitted).)

5                                        **DISCUSSION**

6    **I.    Defendant Holt**

7            **A.  Substantial Risk of Serious Harm**

8            Defendant Holt's first argues that there is no factual dispute as to whether his actions

9    placed plaintiff at a substantial risk of suffering serious harm.  (ECF No. 50-2 at 7-9.)  Holt's

10   argument centers on his own medical decisions, which he denies were "triggers" for any specific

11   harm allegedly suffered by plaintiff.  (Id. at 8.)

12           Defendant has not met his initial burden as to this prong of the Gordon test.  As the Ninth

13   Circuit has explained, substantial risk of serious harm is an objective, not subjective, inquiry:

14           In the inadequate-medical-care context, the "substantial risk of serious harm"
             prong was met if there was a "serious medical need," such that a "failure to treat a
15           prisoner's condition could result in further significant injury or the unnecessary
             and wanton infliction of pain." This is an objective standard, and includes the
16           "existence of an injury that a reasonable doctor or patient would find important
             and worthy of comment or treatment; the presence of a medical condition that
17           significantly affects an individual's daily activities; or the existence of chronic
             and substantial pain."
18

19   Russell v. Lumitap, 31 F.4th 729, 739 (9th Cir. 2022) (internal footnotes and citations omitted).

20   Under the objective standard, plaintiff's possibly cancerous eye growth was a "serious medical

21   need" worthy of a provider's comment or treatment.  Accordingly, defendant Holt has not met his

22   initial burden as to the substantial risk of serious harm prong.

23           **B.  Objective Reasonableness**

24           Holt's arguments instead go to the "objectively unreasonable" prong of the Gordon test.

25   Under this prong, "[a] defendant can be liable even if he did not actually draw the inference that

26   the plaintiff was at a substantial risk of suffering serious harm, so long as a reasonable official in

27   his circumstances would have drawn that inference." Russell, 31 F.4th at 739.

28           Defendant Holt's argument is supported by the expert declaration of Dr. Adler, who

opines that Holt acted within the standard of care when treating plaintiff.  (Declaration of Dr. Paul Adler ("Adler Decl."), ECF 50-1 at 4-15.)  The undersigned finds that Dr. Adler's education, training, and experience qualify him as an expert.  See Fed. R. Evid. 702.  Dr. Adler's experience leading correctional health units, including his past tenure as the Medical Director for the Ventura County Jail system, and overseeing the care of inmates by NPs and other providers, make him qualified to opine on the objective reasonableness of defendant Holt's treatment of plaintiff's eye growth.  Dr. Adler's testimony set forth in his declaration is both relevant and admissible, and his thorough and organized analysis of plaintiff's voluminous medical records is particularly helpful to contextualizing Holt's care.  Therefore, the undersigned accepts Dr. Adler's opinion as expert testimony under Rule 702 of the Federal Rules of Evidence and finds defendant Holt has met his initial burden as to whether his medical treatment of plaintiff met the standard of care.

The burden then shifts to plaintiff to show a dispute of fact as to whether Holt breached the standard of care.  See D.M. v. City of Merced, No. 1:20-CV-0409 JLT SAB, 2024 WL 3540333, at *6 (E.D. Cal. July 25, 2024) ("[A] breach is a necessary (though not sufficient) element" of a Fourteenth Amendment inadequate medical care claim).  Plaintiff, however, has not put forth any expert testimony to rebut Dr. Adler's opinions, and, as a layperson, is not qualified to opine on the appropriate treatment for his eye growth.  See Hutchinson v. United States, 838 F.2d 390, 392 (9th Cir. 1988.)  "When a defendant moves for summary judgment and supports the motion with expert declarations that his conduct fell within the community standard of care, he is entitled to summary judgment unless the plaintiff comes forward with conflicting expert evidence."[6] Id.

Plaintiff did not request the appointment of an independent expert under Rule 706 of the Federal Rules of Evidence.  Instead, in his opposing declaration, plaintiff alleges that in the

---

[6]  This is not a case where the standard of care is obvious or would be within the common knowledge of a layperson.  In such a case, a plaintiff might not need to procure an expert declaration to survive summary judgment against an expert-equipped opponent.  Cf. San Antonio Regional Hosp. v. Superior Court, 102 Cal.App.5th 346 (2024) ("The first element, standard of care, is the key issue in a malpractice action and can only be proved by expert testimony, unless the circumstances are such that the required conduct is within the layperson's common knowledge.") (emphasis added).

14

1   "beginning of May 2021," defendant Holt told him there was nothing wrong with him and that he

2   should go back to his pod.  (ECF No. 58 at 2.)  Plaintiff then put in another kite and had to "wear"

3   down defendant Holt to put him up for a doctor.  (Id. at 2-3.)

4          Holt's alleged delay is belied by the record.  Plaintiff's medical file shows Holt first saw

5   plaintiff on May 28, 2021, not the beginning of May, to address ankle pain.[7]  (ECF No. 50-1 at

6   292-294.)  Plaintiff submitted a kite complaining of "problems with my eyes" the next day.  (Id.

7   at 798.)  This kite triggered plaintiff's first eye-related visit with Holt on June 2, 2021, where Holt

8   noted NP Burnett's dermatology referral and made his own ophthalmology referral.  (Id. at 285-

9   288.)  Plaintiff then saw Dr. Wong on June 10, 2021, less than two weeks after his first meeting

10  with Holt.  (Id. at 284-286.)  The nonmoving party's version of the facts need not be credited if it

11  is blatantly contradicted by the evidence.  See Vos v. City of Newport Beach, 892 F.3d 1024,

12  1028 (9th Cir. 2018); see also F.T.C. v. Stefanchik, 559 F.3d 924, 929 (9th Cir. 2009) ("A non-

13  movant's bald assertions or a mere scintilla of evidence in his favor are both insufficient to

14  withstand summary judgment.") (citation omitted).

15         Plaintiff also alleges that, in September 2021, Holt dismissed plaintiff's pain and warned

16  him to stop sending kites.  (Id. at 5.)  Plaintiff's medical record does not reflect a visit with Holt

17  after August 23, 2021.  But even accepting this allegation as true, plaintiff does not explain how

18  Holt's comment affected his medical care or caused him injury.  See Gordon, 888 F.3d at 1125

19  (fourth prong requires injury and causation).  It is undisputed that plaintiff's surgery with Dr.

20  Ierokomos was planned by August 17, 2021 (ECF No. 50-1 at 268),[8] and that defendant Holt

21  conducted a pre-surgical visit on August 23, 2021.  (Id. at 267-269.)  No rational trier of fact

22  could find Holt objectively deliberate indifferent to plaintiff's eye growth in September 2021

23  where the record shows the growth was already scheduled to be excised.

24         In sum, plaintiff's declaration and exhibits do not rebut Dr. Adler's opinion that defendant

25  Holt exercised the proper standard of care during the eye-related appointments on June 2, 2021,

26  _____

27  [7]  Holt issued plaintiff a lower bunk assignment.  Plaintiff had raised ankle pain in his medical grievance dated April 26, 2021 (ECF No. 42 at 7) and in a kite filed May 24, 2021 (id. at 797).

28  [8]  At this visit, Dr. Ierokomos determined surgery was needed but that a biopsy was unnecessary because the growth "obviously needs to come out[.]"  (ECF No. 50-1 at 444-445.)

1    and August 23, 2021, respectively, or otherwise create genuine issues of fact regarding the

2    objective reasonableness of defendant Holt's medical care.  Accordingly, the undersigned

3    recommends that summary judgment be granted to defendant Holt.

4    **II.    Defendant Mencias**

5         **A.  Inadequate Linkage**

6         Section 1983 requires there be a link between the defendant's action and the deprivation

7    suffered by plaintiff.  See <u>Monell v. Dep't of Social Services</u>, 436 U.S. 658, 694 (1978); <u>Rizzo v.

8    Goode</u>, 423 U.S. 362, 370-71 (1976).  A plaintiff can demonstrate that link through facts

9    showing: (1) a defendant's "personal involvement in the constitutional deprivation," or (2) that a

10   defendant set "in motion a series of acts by others" or "knowingly refus[ed] to terminate a series

11   of acts by others, which [the defendant] knew or reasonably should have known would cause

12   others to inflict a constitutional injury."  <u>Starr v. Baca</u>, 652 F.3d 1202, 1207-08 (9th Cir. 2011)

13   (quotation marks and citation omitted).  In other words, a defendant "subjects" another to the

14   deprivation of a constitutional right, within the meaning of § 1983, "if he does an affirmative act,

15   participates in another's affirmative act, or omits to perform an act which he is legally required to

16   do that causes the deprivation of which complaint is made."  <u>Johnson v. Duffy</u>, 588 F.2d 740, 743

17   (9th Cir. 1978).  Here, defendant Mencias argues plaintiff has not established she personally

18   participated in any deprivation of his rights.  Specifically, she maintains her role was "purely

19   administrative" and that she had no direct role in plaintiff's medical care.  (ECF No. 51-1 at 10.)

20        Defendant provides no authority for her assertion that administrators cannot violate a

21   pretrial detainee's right to adequate medical care.  Some government administrators, like other

22   officials who are responsible for supervision or oversight, may well be in a position to

23   "terminate" acts by others that the administrator "knew or reasonably should have known would

24   cause others to inflict a constitutional injury."  <u>Starr</u>, 652 F.3d at 1207-08.  For example, medical

25   indifference "may appear when prison officials deny, delay or intentionally interfere with medical

26   treatment, <u>or</u> it may be shown by the way in which prison physicians provide medical care."

27   <u>James v. Lee</u>, 485 F. Supp. 3d 1241, 1263 (S.D. Cal. 2020) (emphasis added) (quoting

28   <u>Hutchinson</u>, 838 F.2d at 394).

Moreover, the record is ambiguous as to whether Mencias' role was purely administrative. Mencias is a registered nurse. (Declaration of G. Mencias ("Mencias Decl.") ¶ 3, ECF No. 51-3 at 90.) Her face-to-face visit with plaintiff on December 9, 2021, was documented as a confidential "Nurse Sick Call: Nurse Patient Encounter," occurred in a medical exam room, and resulted in a "nursing diagnosis." (ECF No. 51-3 at 63-65.) Her note dated October 27, 2021, is labeled a "Nurse Non Face to Face" encounter and identifies her as the "Provider." Thus, there is some evidence Mencias provided care. Accordingly, she has not met her initial burden to show there is no disputed fact as to linkage.

## B. Whether Mencias' Actions Were Objectively Unreasonable

### i. ENT Referral

The undersigned next turns to defendant Mencias' specific actions that plaintiff alleges violated his Fourteenth Amendment right to adequate medical care. Plaintiff's primary claim is that defendant Mencias violated his constitutional rights by referring him to an ENT, instead of an ophthalmologist, on July 15, 2021. (ECF No. 8 at 3; ECF No. 58 at 3.)

Defendant Mencias does not admit to making the ENT referral at issue.[9] To refute that the referral itself was inappropriate, she offers the expert declaration of Dr. David Kiener, a board-certified otolaryngologist. (Declaration of David J. Kiener ("Kiener Decl.") ¶ 2, ECF No. 51-3 at 79.) Otolaryngologists are ENT specialists. (Kiener Decl. ¶ 18.) Dr. Kiener opines that defendant's referral to an ENT, Dr. Ireokomos, was appropriate because an ENT is trained in the surgical removal of face/head lesions. (Id. ¶¶ 18, 32.) He also found that the "offending eye was … completely, and successfully, surgically removed … mitigating the potential for resurgence of the lesion, and the consequences of what was concluded to be a basal cell carcinoma." (Id. ¶ 32.)

The undersigned finds that Dr. Kiener's education, training, and experience qualify him as an expert. See Fed. R. Evid. 702. His nearly forty-years as a board-certified otolaryngologist make him qualified to opine on the appropriateness of defendant's surgical ENT referral, the

---

[9] According to Mencias' declaration in the habeas case, the referral was made by the "Medical Director and Case Management for Correctional Health Services." (ECF No. 42 at 14.) For purposes of this motion, the undersigned will assume that "Case Management" includes Mencias.

17

1   surgery performed by fellow ENT Dr. Ierokomos, and the jail's post-operative care. Dr. Adler's

2   testimony set forth in his declaration is both relevant and admissible, and based on a thorough

3   analysis of plaintiff's FAC and complete medical record. (Kiener Decl. ¶ 4.) Accordingly, the

4   undersigned accepts Dr. Kiener's opinion as expert testimony under Rule 702 and finds defendant

5   Mencias has met her initial burden as to whether the ENT referral met the standard of care.

6        Plaintiff has not put forth expert testimony to rebut Dr. Kiener's opinions regarding the

7   appropriateness of ENT referral and, again, is not qualified to speak on this subject himself as a

8   layperson. The fact that an ENT, Dr. Ierokomos, successfully performed the very surgery

9   plaintiff pursued further undermines his assertion that the ENT referral was objectively

10  unreasonable.

11       Plaintiff's hyperfocus on the ENT referral appears to stem from this passage in Judge

12  Sweet's order to show cause in plaintiff's habeas action, dated August 9, 2021:

13       Nor is any light shown on why petitioner would be referred to an "ear, nose, and
         throat" specialist (i.e., an otolaryngologist) regarding a potential growth under or
14       on the <u>eye</u>, a matter noted by petitioner …. Nor does [Mencias'] affidavit reflect
         any date set for an appointment with the ophthalmologist, who would appear to be
15       the proper specialist to determine the nature of any growth actually on petitioner's
         eye[.]
16

17  (ECF No. 42 at 22-23 (emphasis in original).) When read in context, Judge Sweet was criticizing

18  the lack of documentary support affixed to the declaration Mencias submitted in the habeas case.

19  His legitimate questions and requests for documentation do not amount to expert testimony or

20  otherwise create genuine issues of fact as to whether the ENT referral was unreasonable.

21       To be sure, the existence of plaintiff's state habeas action, and the state court's direct

22  intervention in plaintiff's care, gives the undersigned significant pause. Defendant Mencias does

23  not address the habeas case in her motion. Plaintiff submitted only piecemeal filings that do not

24  provide the full picture of the habeas proceedings or where they currently stand. But even

25  inferring from the timing that Judge Sweet's July 9, 2021, request for an informal response (ECF

26  No. 42 at 16) was the impetus for the ENT referral on July 15, 2021, it does not establish a

27  genuine issue of material fact as to whether Mencias' ENT referral itself, as opposed to an

28

1  ophthalmology referral as plaintiff wanted, was objectively unreasonable.[10]

2  ### ii.  Post-Operative Care

3      Plaintiff's final argument is that defendant Mencias and her staff were indifferent to his

4  eye pain in the months following his surgery.  (ECF No. 8 at 4; ECF No. 58 at 6.)  Plaintiff claims

5  that Mencias was his criminal attorney's point of contact during this period and "continually

6  stonewalled" attempts to get plaintiff care.  (ECF No. 8 at 4.)

7      Dr. Kiener opines that the post-operative care plaintiff received, described at length in

8  Mencias' SUFs above, "conformed with the standard of care, were adequately addressed, and did

9  not cause [him] injuries."  (Kiener Decl. ¶ 35.)  As to plaintiff's claim that there was a delay

10  between his eye complaints and the subsequent treatment or visits, Dr. Kiener states the delays

11  "were neither unusual, given the nonemergency nature of his complaints, nor did any such delay

12  cause [plaintiff's] injuries."  (Id. ¶ 36.)  The undersigned finds that defendant Mencias has met

13  her initial burden as to this post-operative period of plaintiff's care.

14      Again, plaintiff has not put forth expert testimony to rebut Dr. Kiener's opinion.  Nor has

15  he put forth specific evidence of Mencias' alleged "stonewalling."  It is undisputed that Mencias

16  saw plaintiff face-to-face on December 9, 2021, at the request of Judge Sweet, and that she

17  scheduled a next-day appointment with the in-house physical Dr. Kahlon.  (Mencias Decl. ¶ 6;

18  ECF No. 51-3 at 63.)  It is reasonable to infer that there was some reason for Judge Sweet to

19  intervene, but the undersigned cannot divine that reason or attribute it to Mencias without

20  evidence.  Lastly, even assuming Mencias was the "nurse in charge at RCCC" as plaintiff alleges

21  (see ECF No. 8 at 2), she cannot be held vicariously liable for the actions of her staff.  "There is

22  no respondeat superior liability under section 1983 . . . [o]fficers may not be held liable merely

---

23  
24  [10]  Procedural posture matters.  In the habeas action in mid-2021, it was unclear—based on the apparently underdeveloped factual record in that case—whether plaintiff was getting the real-time
25  care he needed.  Indeed, had plaintiff sought preliminary injunctive relief from this court during that same period of time, such relief would have been appropriate on a showing of irreparable
26  harm and serious questions going to the merits.  See All. For the Wild Rockies v. Cottrell, 632 F.3d 1127, 1134-35 (9th Cir. 2011).  The parties have now had a full opportunity to develop the
27  record through discovery and summary judgment briefing.  At this procedural juncture, the question is not whether there are serious questions going to the merits, but whether there is a
28  genuine dispute as to material facts.

1    for being present at the scene of a constitutional violation or for being a member of the same

2    operational unit as a wrongdoer." Felarca v. Birgeneau, 891 F.3d 809, 820 (9th Cir. 2018).

3    　　　Because there is no genuine issue of fact as to whether defendant Mencias' alleged ENT

4    referral and post-operative actions were objectively unreasonable, the undersigned recommends

5    her motion for summary judgment be granted.

6    　　　　　　　　　　　　　　　　**CONCLUSION**

7    　　　Accordingly, IT IS HEREBY ORDERED that defendant Holt's request for judicial notice

8    (ECF No. 50-4) be DENIED.

9    　　　In addition, IT IS HEREBY RECOMMENDED that:

10   　　　1.  Defendant Holt's motion for summary judgment (ECF No. 50) be GRANTED; and

11   　　　2.  Defendant Mencias' motion for summary judgment (ECF No. 51) be GRANTED.

12   　　　These findings and recommendations are submitted to the United States District Judge

13   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days

14   after being served with these findings and recommendations, any party may file written

15   objections with the court and serve a copy on all parties. Such a document should be captioned

16   "Objections to Magistrate Judge's Findings and Recommendations." Any response to the

17   objections shall be served and filed within fourteen days after service of the objections. The

18   parties are advised that failure to file objections within the specified time may waive the right to

19   appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

20   DATED: August 12, 2025

21

22

23   　　　　　　SEAN C. RIORDAN
       　　　　UNITED STATES MAGISTRATE JUDGE

24

25

26

27

28